JOHN REID, plaintiff in error, vs. JOHN BUTT, adm'r, defendant in error.

[1.] To entitle an administrator to maintain trover against the vendee of his intestate's son and heir at law, it is not necessary to show an order of the Ordinary authorizing a sale of the slaves.

[2.] Where an unmarried son lives with his father, the presumption is that the property on the place belongs to the father. If the father lives with the son, the presumption is the other way.

[3.] Possession of property is *prima facie* evidence of title ; and where the possession is joint, the presumption is in favor of the party who exercises principally, if not exclusively, acts of individual control and dominion over the property.

Reid vs. Butt, adm'r.

[4.] Where it turns out, upon the trial of a cause, that a paper purporting to be a deed of gift to certain slaves not specified, has been in existence and destroyed by the donor, no advantage can be taken of the instrument; nor can any presumptions be made to the prejudice of the party making it, unless it be first made to appear that the paper had been executed and delivered; and that the negroes in dispute were included in it.

[5.] A purchases of B a slave; C, the father of B, dies, and D, the administrator of C, brings an action of trover against A to recover the negro, alleging that it was in the possession of his intestate at the time of his death, and he was the owner thereof.

*Held,* That the plaintiff was entitled to recover the whole property, *aliter,* if the defendant had made proof that there were no debts due by the estate; in that case the plaintiff could only recover the interest or share of the other distributee or distributees of the estate in the property.

Trover, from Union county. Tried before Judge Rice, at November Term, 1857.

This was an action of trover by John Butt, administrator of Robert C. Laughter, deceased, against John Reid, to recover a negro man named Cyrus, alleged to belong to the estate of his intestate.

The defendant set up and claimed title to the negro under a purchase from Robert Laughter, a son of plaintiff's intestate. The father and son lived together, and the testimony was somewhat conflicting as to the ownership and control of the negroes on the place. But as the exceptions go to the rulings and charge of the Court only, it is unnecessary to detail the evidence.

After the testimony was closed, defendant moved for a nonsuit, which the Court refused, holding that an administrator could maintain an action for property which belonged to his intestate at the time of his death, from one claiming under an heir at law, without showing an order of sale from the proper Court. To which decision defendant excepted.

The Judge charged the jury that where a son lives with his father, the presumption is that all the property on the place belongs to the father, and if the property is the son's it

devolves upon him, or those claiming under him, to prove it. But if the father lives with the son, then the presumption is otherwise and the *onus* changed.

The Court further charged the jury that the possession of property was *prima facie* evidence of title, and if it was proved that the negro in controversy was in possession of plaintiff's intestate in his lifetime and at the time of his death, that was *prima facie* evidence of title to the same. And if it was proven that he hired him out, that was higher evidence of title; and if he received the price of the hire, that was still higher evidence.

After stating to the jury that defendant relied upon a deed of gift, which had been destroyed, the Court charged the jury, that to render that deed available it was incumbent on defendant to prove its contents, who made it, what property was therein conveyed, and that it was duly executed, and that Cyrus passed by said deed to Robert Laughter the son. And further, that if the father, after making the deed of gift, retained possession of it, and never delivered the same, he had a right to destroy it; for without delivery it was of no effect. And if the deed was made by one having no title to the property, then no title could thereby pass.

The Court further charged, at the request of defendant's counsel, that if the negro came into the family by a deed of gift to the son, then they should find for the defendant, whether the donor owned the property or not. That if the father disclaimed ownership of the negro, and he and his son had a joint possession, that disclaimer may be considered as evidence of title in the son. That there may be cases where the father lives with his son, and if they should be of opinion that this is one of the cases, then the presumption that the property belongs to the father does not arise. To all of which charge defendant excepted.

The jury found for the plaintiff $1200, which might be dis-

charged by delivering up the negro in ten days, and further, $739 20 for hire.

Whereupon defendant tenders his bill of exceptions and alleges as error the rulings and charges above excepted to.

WM. MARTIN, for plaintiff in error.

PHILLIPS, MILNER, CHISOLM, & WOFFORD, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] Should a nonsuit have been awarded in this case? We hold not; neither upon the ground that the plaintiff showed no order of sale from the Court of Ordinary, nor on account of the insufficiency of the proof.

Suppose it be true that the boy Cyrus was sold by the son in the lifetime of the father, although there is positive and unequivocal proof that he was in the possession of the father at the time of his death, still there is testimony enough in support of the father's *title* to carry the case to the jury.

[2.] The next objection is to the charge of the Court as to the presumptions which arise from the possession of property where the father and son live together. After scanning carefully this portion of the charge of the Court, we see no error requiring correction. And further, we think that the proof in the case warranted the charge upon this point.

[3.] The Court charged, amongst other things, that "the possession of personal property was *prima facie* evidence of title; that hiring out the property was still higher evidence of title in the hirer; and that if he received the pay as his own, it was higher evidence still of title in the hirer."

Perhaps as an abstract proposition, or one as applicable to parties generally, who are litigating respecting personal property, this charge would be obnoxious to the criticism made upon it by defendant's counsel, and could hardly be sustained. But understanding it as we do, and as made in reference to the facts of the case, we are inclined to think it was right.

Here the dispute is between father and son, as to the ownership of a family of negroes; or to speak more accurately, between the administrator of the father and the purchaser under the son. The father, in his lifetime, and son lived together; no paper title is shown in either. The son came out first to this State; rented a piece of land, and then the father followed, accompanied by these slaves. The family consisted of father, this son and a daughter. The question of title is mainly dependent upon the question of possession. And the presumption is in favor of one or the other, according to the preponderance of individual acts of control and dominion exercised by each. In view of this state of things the Court instructed the jury, that possession is *prima facie* evidence of title; and in determining the question of possession, if the father hired out the slaves, the presumption is strengthened that he owned the negroes; if he received pay for them as his own, this is higher evidence still that he, and not the son, owned the slaves.

[4.] It is insisted that all this should count for nothing, inasmuch as it does not appear that the son had notice of this hiring. The jury were not only authorized to infer that the son had notice, but they could not believe otherwise. In 1846 and 1847, two of the negroes, Cyrus, the boy in controversy, and Harriett, a girl, were hired by the father to the witness, Curtis. The old man took the negroes to the witness and brought them away, when the term of service had expired. He paid the wages monthly to the father. Another witness hired another one of these negroes from the old man, for one year, and returned the slave before the old man died. Another witness hired another one of these negroes six or eight months in the year 1849. Living together as they did, it is impossible for the son not to have known of these oft-repeated and long continued contracts of hiring. He was never heard to complain. And the Court, in substance, charged, and so we think, that mere acts of ownership, under the circumstances, indicated pretty strongly that

notwithstanding the joint possession, the title was in the father; especially when it is remembered that no such act of dominion was ever exercised by the son. The acts and declarations of the father, that these slaves were the property of the son, were negative in their character; and likely grew out of the deed of gift which the father at one time made to the son, but subsequently destroyed. But here were distinctive acts of individual ownership on the part of the father, necessarily known to, and for aught that appears to the contrary, acquiesced in by the son. Certainly in this view of the charge we are clear; it was proper, under the peculiar facts of this case.

[4.] Was there error in the Court in its instructions respecting the deed of gift?

It appears from the testimony that a paper was carefully deposited in a cheese box, and locked up in the trunk of the father, which he called a deed of gift to Robert, his son; complaining to his near neighbor, Mr. Farmer, that his son had not treated him well, he directed him where to find the paper, and it was deliberately burnt in the presence of the witness; the father remarking at the time: " This is an end of that. Bob shall not have my property."

It is complained that the Court erred in holding that so far as the title depended upon this paper, it must appear that it was duly executed, and that the negro in dispute passed by it. Whereas, counsel contend that the paper having been destroyed by the father, every presumption is to be made against him as the spoliator of the title. But this argument assumes that this instrument was a title. That it had been duly executed and delivered. If it had always remained in the possession of the father, it was a nullity, and he had a right to destroy it. For myself I am fully persuaded that it never was delivered. I infer this not only from the careful custody and concealment of it by the father, but if it ever had been delivered the son knew it, of course, he being the

donee in the deed ; and yet he never attempts to procure the benefit of this important document by giving notice to produce it, establishing it as a lost paper, or proving its destruction and contents. Had he known of the existence of this deed of gift, would he not have taken some steps to make it available, seeing that it would have settled forever this controversy ? He says, through his counsel, that he never heard of its destruction until it came out on the trial. If he knew of its existence and not of its loss, how much more probable that he would have taken measures to obtain it.

The truth is, he knew nothing of it, it not having been delivered. And yet all this disclosure shows that the father thought the property his, and that a conveyance from him was necessary to pass the title to his son. And it is a key to all the declarations he made, that these negroes belonged to his son. During the existence of this paper he so spoke of them. And if they did not pass by this inchoate deed, when and how did the son acquire the title ?

[5.] Passing over several minor matters, which amount to nothing, counsel for the plaintiff in error argue that the administrator can only recover one half of the property; and that as heir at law, the son's title to Reid to the other half is good. Had the defendant gone into equity and shown that the son, under whom he claimed, was the only heir, and that there were no debts, he might have been entitled to a perpetual injunction against the action of trover. Or if it turned out that Mrs. England, the sister of Robert C. Laughter, was living, or if dead before her father, left children, or since, a husband, then if there were no debts, the recovery would have been restricted to one half the property. Perhaps the same proof might have been made at law, attended with the same results. But no such evidence was submitted. For any thing that appeared to the contrary, the administrator was entitled to recover the whole property, or its equivalent in value.

Upon the whole, the justice of the case is with the defend-

ant in error, and for aught that appears in the record to the contrary, the law of the case has been properly administered.

Judgment affirmed.